JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Damina Durham
3855 Blair Mill Road, Unit 216 B, Horsham, PA 19044

**DEFENDANTS**
Capital Academy and          Sequel Youth and Family Services
1770 Mt. Ephraim Avenue      1131 Eagletree Lane
Camden, NJ 08104             Huntsville, Alabama 35801

(b) County of Residence of First Listed Plaintiff: Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Camden
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Bochetto & Lentz, P.C., Bryan R. Lentz, Esquire
6000 Sagemore Drive, Suite 6301
Marlton, New Jersey 08053

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☒ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - Other / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | ☐ 448 Education / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Diversity Jurisdiction: 28 U.S.C.§1332 (a), Conscientious Employee Protection Act: N.J.S.A.§ 34:19-1, et seq.

Brief description of cause:
Unlawful Termination under the Conscientious Employee Protection Act

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** in excess of $150,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE: 02/13/2018
SIGNATURE OF ATTORNEY OF RECORD: *[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT AT NEW JERSEY
# CAMDEN VICINAGE

| | | |
|---|---|---|
| **DAMINA DURHAM** | : | |
| 3855 Blair Mill Road, Unit 216B | : | CIVIL ACTION |
| Horsham, Pennsylvania 19044 | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | No. |
| v. | : | |
| | : | |
| **CAPITAL ACADEMY** | : | |
| 1770 Mt. Ephraim Avenue | : | |
| Camden, New Jersey 08104 | : | |
| | : | **COMPLAINT AND JURY DEMAND** |
| and | : | |
| | : | |
| **SEQUEL YOUTH AND FAMILY** | : | |
| **SERVICES** | : | |
| 1131 Eagletree Lane | : | |
| Huntsville, Alabama 35801 | : | |
| | : | |
| *Defendants.* | : | |

## CIVIL ACTION COMPLAINT

**AND NOW**, comes Plaintiff, Damina Durham ("Durham" or "Plaintiff"), by and through undersigned counsel, Bochetto & Lentz, P.C., in support of her Complaint against Defendants, Capital Academy ("Capital" or the "Academy") and Sequel Youth and Family Services ("Sequel") (collectively "Defendants") and avers as follows:

### I.   PARTIES

1. Plaintiff, Damina Durham ("Durham") is an adult individual and former employee of the Defendant Capital Academy. Durham resides at 3855 Blair Mill Road, Unit 216B, Horsham, Pennsylvania 19044.

2. Defendant, Capital Academy ("Capital" or the "Academy") is upon information

and belief a New Jersey company that owns and/or operates a residential treatment facility located at 1770 Mt. Ephraim Ave, Camden, New Jersey 08104.

3. Defendant, Sequel Youth and Family Services ("Sequel") is upon information and belief an Alabama company located at 1131 Eagletree Lane, Huntsville Alabama 35801.

4. Capital is an accredited Behavioral Health Care Organization, registered with the New Jersey Department of Children and Families as a Residential Child Care Facility and licensed for sixty (60) beds. (*See* Capital website attached hereto as **Exhibit "A"**).

5. Capital houses, services, and/or treats juvenile offenders.

6. Upon information and belief, Capital receives payments from the United States Government in the form of Medicare and/or Medicaid.

7. Capital operates two facilities, a "secure facility" located at 1770 Mt. Ephraim Ave., Camden, New Jersey 08104, and a "community home" located at 1024 Collings Ave., Collingswood, New Jersey 08107.

8. Capital is listed as one of Sequels fifteen "Staff-Secure Residential Academies" operating under the corporate umbrella of Sequel on its website www.sequelyouthservices.com. (*See* Sequel website's "Contact Us" page attached hereto as **Exhibit "B"**).

9. Upon information and belief, Sequel owns, operates, and controls Capital and the employees of Sequel manage and direct the activity of Capital as well as the activities of the employees of Capital.

10. Similarly, Sequel's "Jobs" page lists job opportunities (295 total jobs) at other Sequel owned facilities throughout the country, including Capital. (*See* Sequel website's "Jobs" page attached hereto as **Exhibit "C"**).

II. **VENUE AND JURISDICTION**

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is

complete diversity of citizenship between Plaintiff and all Defendants and the amount in controversy exceeds $150,000 exclusive of interest and attorney's fees.

12. Venue is proper in this District pursuant to Title 28 of the United States Code, Section 1391 because Defendants own and operate a facility in Camden County, New Jersey at 1770 Mt. Ephraim Avenue, Camden, New Jersey 08104, Plaintiff worked at Defendants' New Jersey location, and the "operative facts" giving rise to Plaintiff's claim occurred in New Jersey.

13. Defendant Sequel has sufficient minimum contacts with the state of New Jersey based on its control of the employees, management, and operations of Capital.

14. No other forum would be more convenient for the parties and witnesses to litigate this action.

### III. FACTUAL ALLEGATIONS

15. Durham has a master's degree in human service with a concentration in counseling.

16. Durham was first hired by Capital, in June of 2015 as a mental health clinician and told that she had three years to become a licensed Practical Counselor to stay in that position.

17. In or about mid-May of 2016, Durham was notified that she would need to be licensed as a licensed professional counselor ("LPC") by June 1, 2016 to stay in her role—two years sooner than she was originally given to obtain the license.

18. Because tests to become a LPC are only offered several times of year, it was impossible for Durham to become an LPC in only one month.

19. Durham's direct supervisor, Edward Beatty ("Beatty") suggested that she consider transitioning to a Quality Assurance position because the Quality Assurance Manager, Rayna Anderson ("Anderson") had resigned.

20. In or about mid-June 2016, Durham transitioned to the role of Quality Assurance

Manager / HIPAA Compliance Officer ("QA").

21. During the transition, Durham worked during weekends with Anderson—who had already departed Capital—in order to learn the duties and responsibilities of the QA role.

22. Upon information and belief, Donald Christiano ("Christiano"), Executive Director of Capital, instructed Anderson not to train Durham on all of Anderson's responsibilities, in order to limit her access to company information.

23. As an example, Durham was not given access to financial information and other reports that Anderson had been responsible for while she was in the QA role.

24. After assuming the QA role, Durham was adamant about following rules and regulations and reported conduct which she believed was improper or unlawful.

25. Throughout her time as QA, until her termination in September of 2017, Durham consistently enforced the rules and regulations and fulfilled her obligations as a QA officer.

26. Upon information and belief, because of Durham's diligence and honesty, Defendants continued to exclude Durham from certain key aspects of Defendants' business, even though they were listed as QA duties on her job description.

**Defendants Violated State Regulations by Filing False and Incomplete Incident Reports**

27. Because they house and treat juveniles, Capital and Sequel are subject to strict reporting requirements designed prevent abuse and mistreatment.

28. Pursuant to New Jersey regulations for juvenile detention facilities, N.J.A.C. § 13:92, *et seq.*—which are outlined in the Manual of Standards for Juvenile Detention Facilities—incidents involving physical contact or injury require facilities to submit detailed and accurate incident reports.

29. Incident reports are documented on the New Jersey Juvenile Justice Commission's

"Incident Report" form set forth in N.J.A.C. 13:92 Appendix A.

30. By way of limited example only:

   a. For situations "requiring a juvenile's separation from the group and restriction to quarters, an incident report shall be processed and filed with the administration by the end of the shift. The report shall outline in detail the presenting circumstances." N.J.A.C. § 13:92-7.4(m)(3).

   b. Death, injuries which may cause death or serious disability, and suicide attempts must be reported "as soon as practicable, but no later than within 24 hours of the occurrence." N.J.A.C. § 13:92-7.6(a)-(b).

   c. Other incidents, "such as alleged sexual assaults by juveniles or staff, outbreaks of contagious disease, group disturbances involving four or more juveniles, or any situation that requires medical or mental health attention outside the facility for juveniles or staff … shall be reported to the Commission within three days of the occurrence." N.J.A.C. § 13:92-7.6(d).

31. In addition to the incident reports described above, New Jersey regulations also require facilities to log and record information for certain other interactions with juveniles. By way of limited example:

   a. When a juvenile is given medication. N.J.A.C. § 13:92-6.4.

   b. When a juvenile is placed on a temporary restriction, removed from the group, or isolated. N.J.A.C. § 13:92-6.5.

   c. When a juvenile is placed in a mechanical restraint, such as handcuffs, leather restrains, restraint chair or leg irons. N.J.A.C. § 13:92-6.6.

32. Importantly, "[p]hysical contact between staff and detained juveniles, either through acts of self-defense or the use of force to protect a juvenile from harming himself, herself or others, shall be immediately reported in writing to the administrator of the detention facility." N.J.A.C. § 13:92-7.3.

33. Capital must also comply with additional federal and/or state "quality of care" regulations set forth pursuant to 42 U.S. Code § 1396.

34. During Durham's tenure at Capital, there were several reportable incidents where Capital either did not report the incident or submitted reports that contained false information.

35. Durham made several complaints about the false and incomplete reporting, both in person and in writing, first to Beatty—Durham's supervisor in her initial clinician role—and later to the executive director, Christiano—Durham's supervisor in her QA role—as well as HR Manager Beverly Turner ("Turner").

36. Beatty personally complained to Christiano regarding Durham and Beatty's concerns that reportable incidents were being unreported and/or falsely reported.

37. Defendants took no action to address Durham's concerns or correct the issues that she brought to their attention.

38. Defendants acted knowingly and purposefully in not reporting and/or making false reports in violation of applicable laws and regulations.

39. Upon information and belief, Defendants instructed executives, namely Christano and another employee Glen Thomas ("Thomas") to coach staff and juveniles how to report incidents and what to say in the event that an investigation ensued.

40. There was a "NO SNITCHING" policy in effect at Capital, and staff would offer juveniles incentives to corroborate false narratives about reportable incidents.

41. Christiano was aware of the aforementioned conduct, practices, and policies, and was willfully indifferent and/or an active participant.

42. Among the incidents Durham became aware of, from the information provided by co-workers, is an incident involving the sexual assault of a juvenile resident by a counselor on staff at Capital.

43. According to Durham's co-worker, the juvenile victim was promised an early

release from the facility if he denied the assault.

44. The practice of adjusting a juvenile's release date as a way to gain cooperation was well known and accepted by Capital's management, including Christiano.

45. The counselor who assaulted the juvenile was allowed to resign to avoid termination and the abuse was never accurately reported.

**Sequel was Aware, Willfully Indifferent, and/or an Active Participant in Capital's Conduct**

46. In or about the summer of 2016, one of Durham's colleagues attended a Sequel national conference where he spoke to an individual employed at Sequel's headquarters.

47. Her colleague relayed that he voiced his concerns to others at the conference about significant incidents at Capital which were unreported and/or reported falsely or inaccurately.

48. He also voiced concerns about the "NO SNITCHING" policy and staff's bribing juveniles to corroborate false narratives about reportable incidents.

49. In response, the Sequel employee stated that Sequel is aware that there are "issues" with Capital, but Sequel executives ignore the issues because it's such a huge money maker and profit center.

50. Upon information and belief, Capital is one of Sequel's most profitable locations.

51. Upon information and belief, Sequel executives are aware of the conduct, practices and policies at Capital, but are willfully indifferent and/or active participants because Capital is a large profit center for Sequel.

**Defendants Retaliated Against Durham for Reporting Unlawful Conduct**

52. On or about July 25, 2017, Durham personally witnessed what she reasonably believed, from her experience at Capital, to be a staff "team leader" improperly restraining a juvenile. (*See* Durham's Incident Report attached hereto as **Exhibit "D"**).

7

53. Durham contacted Christiano to notify him about the conduct and to ensure that the incident was properly reported and logged.

54. Unable to reach Christiano, Durham contacted the HR manager, Turner.

55. Turner instructed Durham to personally report the conduct to the Institutional Abuse Investigation Unit ("IAIU").

56. The IAIU is a child protective service unit that investigates allegations of child abuse and neglect in out-of-home settings such as foster homes, residential centers, schools, detention centers, etc. within the New Jersey Department of Children and Families.

57. Durham reported the conduct to the IAIU as well as the administrative team at Sequel's corporate headquarters in Alabama.

58. Several days after making the report, Durham became concerned because no one from IAIU had contacted her.

59. Typically, IAIU investigates all such reports within twenty-four (24) hours.

60. Approximately three days after her initial report, Durham followed up with IAIU and was informed that an investigator had already been to the school the student attended, but had not come to the facility or contacted Durham for an interview.

61. This further perplexed Durham because, as an eye witness to the conduct and the source of the report, she was never notified that an IAIU investigator had been on site.

62. When Durham finally reached the IAIU investigator, Jorge Chang ("Chang"), it appeared that he had already made his decision about the conduct, without hearing her eyewitness account.

63. Moreover, Chang alluded to the "fact" that Durham was "disgruntled" because she was "demoted" from a mental health clinician to QA.

64. Durham's move from mental health clinician to QA was not a demotion, because her salary did not change, nor was she in any way disgruntled about the change in role, which occurred over one year before the incident she reported.

65. There was no way that Chang would know about Durham's "demotion" and/or supposedly "disgruntled" attitude, without someone from Capital making that representation during the investigation.

66. Upon information and belief, someone from Capital sought to undermine Durham's credibility by characterizing Durham as disgruntled and falsely representing that her actions were improperly motivated.

67. As a follow up to her report to Sequel's corporate headquarters, Durham was asked to participate in a conference call with Sequel corporate management and HR in Alabama.

68. The conference call which took place on August 1, 2017 included Sequel employees Sylvia Steger ("Steger"), Roy Day ("Day"), and Alex Britt ("Britt").

69. During the conference call, Durham again described in detail what she had witnessed on July 25, 2017.

70. She also relayed in detail her other concerns with Capital's incomplete and false reporting practices.

71. The next day, on August 2, 2017, Durham followed up with an email documenting her claims and concerns.

72. The email included evidence of the regulatory reporting infractions and evidence of what she believed to be harassment and/or retaliatory conduct toward Durham by the staff of Capital. (*See* Durham's August 2, 2017 Email attached hereto as **Exhibit "E"**).

73. Durham made it clear that she believed the retaliation—which included placing a

9

screw in her tire—was in direct response to her reports and complaints. *See* Ex. E.

74. On or about August 3, 2017, in response to a written request for information from Sequel management, Durham prepared and submitted to Sequel an even more detailed report entitled Corporate Report Submission ("CRS") (*See* Durham's CRS attached hereto as **Exhibit "F"**).

75. The CRS outlined the details of multiple regulatory violations and included exhibits, emails and citations to the specific regulations that were being violated. *See* Ex. F.

76. The CRS also restated the facts relating to the juvenile restraint that she witnessed on July 25, 2017 at Capital as well as her concerns about interference in and manipulation of the ensuing investigation. *See* Ex. F.

77. Despite Durham's participation in the internal investigation, the detailed reporting contained in her August 2, 2017 Email, and the CRS, neither Sequel nor Capital management took any steps to correct the infractions or protect Durham from retaliation.

78. Instead, a little over a month later, on September 7, 2017, Durham was called into a meeting with Christiano, Day, Britt, and Sequel Vice President Kenny Roberts—where she was terminated as an employee.

79. Christiano and the others did not characterize her departure as a termination. Instead, she was issued a notice that Capital was undergoing a reduction in force ("RIF") and a "restructure of the Administrative Department." (*See* RIF letter attached hereto as **Exhibit "G"**).

80. The RIF was on Sequel letterhead. (*See* Ex. G).

81. According to the RIF, Durham could either:

   a. Accept a demotion from her salary of fifty-five thousand dollars ($55,000) per year, to a part-time position in the restructured department, at a rate of $14.45 per hour, for up to twenty-nine (29) hours per week – amounting to a salary of less than twenty-two thousand

($22,000) dollars and making Durham ineligible for benefits; or

    b.   terminate her employment with Capital.

(*See* Ex. G).

82.    Because of her personal financial obligations, the "offer" of a 50% cut in salary was not a viable option.

83.    Defendants knew that Durham could not accept such a drastic cut in her income.

84.    As a result, Durham had no choice but to decline the demotion and pay cut.

85.    Durham was escorted from the building and terminated later that day, on September 7, 2017.

86.    Despite claiming that the termination was part of a RIF, Capital hired several additional employees after Durham left.

87.    The other employees terminated with Durham, as part of the RIF, had also complained about unlawful conduct at Capital.

**COUNT I**
**VIOLATION OF CONSCIENTIOUS EMPLOYEE PROTECTION ACT,**
**"CEPA" N.J.S.A. §34:19-1 et. seq.**
**(PLAINTIFF DAMINA DURHAM VS. DEFENDANTS CAPITAL ACADEMY**
**AND SEQUEL YOUTH AND FAMILY SERVICES)**

88.    Plaintiff incorporates by reference herein all prior paragraphs as if fully set forth at length.

89.    At all times material hereto, Plaintiff was an employee of Defendant Capital.

90.    At all times material hereto, Defendant Sequel owned, operated, and/or exercised control over Defendant Capital.

91.    At all times material hereto, Defendant Sequel exercised control over and maintained an agency relationship with the management team of Defendant Capital.

92. At all times material hereto, the individuals referenced herein, including but not limited to: Edward Beatty, Donald Christiano, Glen Thomas, and Beverly Turner were agents and employees of the Defendants.

93. The individuals who made the decision to demote and/or terminate Plaintiff were agents and or under the control of Defendant Sequel.

94. On multiple occasions, Plaintiff objected to and reported unlawful and improper conduct at Capital.

95. On multiple occasions, Plaintiff reported unlawful and improper conduct to her superiors.

96. On multiple occasions, Plaintiff reported that she was the victim of retaliation as a result of her reporting and complaints about compliance.

97. Plaintiff has a reasonable basis to believe the truth of all of the allegations raised in this lawsuit.

98. As a direct and/or proximate result of Plaintiff's objection to Defendants' improper conduct and Plaintiff's reporting of the unlawful and improper conduct, Defendants retaliated against Plaintiff under the auspices of a RIF.

99. Specifically, Defendants unlawful and improper conduct was in violation of N.J.A.C. § 13:92, *et seq*.

100. Plaintiff specifically cited to state regulations that were being violated when she complained to management.

101. Moreover, upon information and belief, Defendants conduct is in violation of other local, state, and/or federal regulations promulgated pursuant to the "quality of care" provisions of 42 U.S. Code § 1396.

102. As a result of her objection to and reports of unlawful conduct, Durham is a protected employee under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. §34:19-1 *et. seq*.

103. Specifically, N.J.S.A. § 34:19-3 provides in relevant part, that a protected employee is one who:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>    1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or …
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>    1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

N.J.S.A. § 34:19-3 (emphasis added).

104. Durham made multiple complaints to her superiors and objected to Defendants' unlawful and improper conduct as set forth above.

105. Moreover, in or about July 25, 2017, after Durham personally witnessed an incident wherein she believed that a juvenile was treated in violation of applicable laws.

106. Because she personally witnessed the incident, because of her concern that

13

Defendants would not properly document the incident, and because Defendants have previously failed to take any action in response to her prior complaints, Plaintiff reported the incident to the IAIU.

107. Plaintiff also complained about Defendants' general practice of violating specific New Jersey regulations and informed management that she was the victim of retaliation.

108. Because of her reports, Defendants retaliated against Plaintiff by giving her two inferior options, either accept a demotion—cutting her salary in less than half and eliminating her benefits—or be terminated.

109. Defendants, with malice or willful or wanton disregard of Plaintiff's rights, have taken the aforementioned retaliatory action(s) against Durham in violation of N.J.S.A. §34:19-3 *et. seq.*

110. Plaintiff's repeated reports to superiors regarding unlawful and improper actions were determinative factors in Defendants' decision to demote and/or terminate her.

111. Additionally, Defendants' conduct justifies punitive damages pursuant to N.J.S.A. §34:19-5 which states that:

> [T]he court or jury may order: the assessment of a civil fine … ; punitive damages; or both a civil fine and punitive damages. In determining the amount of punitive damages, the court or jury shall consider not only the amount of compensatory damages awarded to the employee, but also the amount of all damages caused to shareholders, investors, clients, patients, customers, employees, former employees, retirees or pensioners of the employer, or to the public or any governmental entity, by the activities, policies or practices of the employer which the employee disclosed, threatened to disclose, provided testimony regarding, objected to, or refused to participate in.

N.J.S.A. §34:19-5

112. Upon information and belief, Defendants' management and executive level employees knew about Plaintiff's reports, ignored her reports, actively participated in the conduct, knew that the conduct referenced herein was unlawful, but nonetheless directed Defendants' employees to engage in the conduct in the interest of profitability and to avoid scrutiny by governmental bodies and regulatory agencies.

113. Upon information and belief, Defendants' conduct was fraudulent, unlawful, detrimental to juvenile safety, a violation of federal and state law, and/or a violation of regulatory standards as well as Defendants' duties to its juvenile patients/residents.

114. Despite Plaintiff repeatedly voicing her concerns and objecting to the conduct referenced herein, Defendants' upper management and executive level employees were willfully indifferent to Plaintiff's concerns and continued to engage in the unlawful conduct nonetheless.

115. Further, upon information and belief, Defendant Sequel's executive level employees stood to financially benefit from ignoring the conduct occurring at Defendant Capital.

116. Upon information and belief, Defendants' executive level employees approved adverse action against the Plaintiff, in part, because her complaints would raise additional scrutiny by government bodies and/or regulatory agencies.

117. Accordingly, Defendants' conduct was particularly egregious because it involved willful indifference and actual participation by Defendants' executive level employees.

118. As a direct and proximate result of Defendants' knowing violation of Durham's rights under CEPA, Plaintiff has sustained severe emotional distress, humiliation, embarrassment, mental anguish, loss of personal dignity, loss of wages, and other economic losses.

**WHEREFORE**, Plaintiff Damina Durham demands judgment in excess of $150,000 against Defendants Capital Academy and Sequel Youth and Family Services for the following:

a)  For compensatory damages, plus reinstatement and payment of back and future wages and benefits.

b)  For statutory damages pursuant to CEPA, N.J.S.A. §34:19-1, *et. seq*.

c)  For punitive damages pursuant to CEPA, N.J.S.A. §34:19-1, *et. seq*.

d)  For reasonable attorney fees and costs of suit pursuant to the fee shifting provisions of CEPA, N.J.S.A. §34:19-1, *et seq*.

e)  For such other and further relief as the court may deem just and equitable.

## JURY TRIAL DEMAND

Trial by a 12-member jury is hereby demanded on all issues.

**BOCHETTO & LENTZ, P.C.**

Date:  February 35.''423:

By: /s/ Bryan R. Lentz
Bryan Lentz, Esquire
Anton Kaminsky, Esquire
(NJ I.D.: 029621993, 211632016)
6000 Sagemore Drive, Suite 6301
Marlton, New Jersey 08053
(856) 722-9595
(856) 722-5511 fax
blentz@bochettoandlentz.com
akaminsky@bochettoandlentz.com

16